Now, even if AOL was, under some circumstances, selling at a discount, it wasn't giving those services away. And those services clearly had value. I'm out of time. Thank you. Thank you. We'll take the manual under advisement. We will have the disk shipped to Judge Roth. We will have a conference.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I will hear counsel in the modern ... in my applications. One counsel from each side, off the mic for a minute in this case. One. One.  Three.        Eleven.      Seventeen.   Twenty. Twenty-one. Twenty-two. Twenty-three. Twenty-four. Twenty-five. Twenty-six. Twenty-seven. Twenty-eight. Twenty-nine. Twenty-nine.  Twenty-eight. Twenty-nine. Twenty-nine. Twenty-nine. Twenty-nine. The government has a labor in war, so ... Who on the record want to thank counsel? I know. Each counsel has traveled quite a distance, in one case across the country, in one case down the East Coast, but we ... and we know you've been ... had the benefit of Philadelphia's hospitality. Thank you, Your Honor. May it please the court. Mark Eckenleider with the Department of Justice for Appellants of the United States. Can you speak up? Yes, Your Honor. Mark Eckenleider, Department of Justice for Appellants of the United States. I'd like to reserve four minutes for rebuttal. That's fine. Your Honor, this case is about the government's request for a court order compelling routine business records held by a communications service provider. The lower court's denial of the government's application in this case was in error for two reasons. First, the government proceeded under the appropriate statutory framework and made the requisite factual showing under that statute. And second, there is no constitutional bar to the government's compulsion of the records at issue in the application before the court. Let's stick to the statute before we get to the constitution, because obviously we're under an obligation to try to do that. I have a lot of questions about the statute, if I can ask from the outset. First of all, what's the difference between material stored for 180 days and material stored for less than that time? I just don't understand the technical relevance. Your Honor, I believe is referring, there's a distinction made in a separate part of the I want to emphasize for the court, that section, of course, relates solely to content. So the contents of communications that are held by a service provider such as... I understand that, but I also think that in order to get at what Congress had in mind in this statute, we ought to understand the entire statute and other related statutes. So these will be some far-reaching questions, because I think that we have to figure out what Congress thought it was doing and did. So I go back to my question. There are some time things. What's the difference between 180 days, one way or the other? If I understand Your Honor's question, I believe that the... Right. What I understand Your Honor to be getting at is why did Congress draw that distinction in the place that it did? Why did it choose 180 days? Yeah. To the best of my understanding, when Congress enacted the underlying statute in 1986, Congress was grappling with some very murky questions... By the way, when you say statute, are you talking about the SCA or something else? The Stored Communications Act, Your Honor, and in particular, Section 2703. Go ahead. Congress was grappling with, at the time, some very murky questions about whether or not the Fourth Amendment would protect certain kinds of information in the hands of a third party. And certainly the legislative history, in particular the Senate and House reports, make clear that there was great uncertainty at the time. The animating factor behind Congress's enactment of the statute was to create statutory protection in the face of such constitutional uncertainty. Now, coming to Your Honor's question... So, in other words, Congress was interested in protecting cell phone users. When you say statutory protection, protection of cell phone users, I mean, I assume... Cell phone users, pager users... Okay, users. Okay, people. You and me. Yes, Your Honor. And so the 180-day distinction, as best can be divine from the legislative history, goes to Congress's concern about how much of a reasonable expectation of privacy attaches, particularly if a customer of a communications service leaves information lying around for a long time, in effect, in the hands of a third party. And so Congress decided... Who is a third party? The cell phone provider? The cell phone provider, the email service provider, the... Well, let's... This is cell phone. Let's stick to cell phone. The cell phone provider. So it has less privacy value if it's older than if it's younger, more recent? I just don't know. I'm trying to understand. And, by the way, if our questions take you beyond your time, we're going to give you extra time. Don't worry about that. All right. As I say, Your Honor, as best can be divine from the legislative history of ECPA from 1986, Congress was trying to draw what it thought were some reasoned distinctions between and among different classes of information in the hands of a third party provider, be that an email service provider, be that a wireless communication service provider. And for stored contents, the contents of a communication, Congress decided, and that's embodied in the subsection Your Honor refers to, 2703A, to draw a distinction to provide heightened protection for information that was in electronic storage, and that, of course, is a term of art within the statute defined in Section 2510, contents that are in electronic storage for 180 days or less may be compelled by the government only pursuant to a warrant. And thereafter, that information may, under the statute, be compelled on a lesser showing under subsection B. I can't explain to Your Honor why it was that Congress chose that particular number, 180 days. I will suggest, Your Honor, that Congress was mindful of the fact that it was unclear, they certainly believed it was unclear whether or not Fourth Amendment protections attached to such stored content. And so they extended protections to certain information, content stored for, let's call it six months or less, and then lesser protection if such information was stored over the long haul by the service provider. So I hope that answers Your Honor's question. Thank you. This case, though, Your Honor, of course, deals with non-content information. Specifically, the government's application in this case was made under Section 2703D, in this case a request for transactional records, historical records, records from the past. And before I delve further into the intricacies of the statute, I'd like to make clear for the Court what this case is not about. The case is not about precise GPS data. Well, but isn't the whole point of this, maybe we're getting, that the government wants to get the identity of the cell phone user? In this case, Your Honor, no. We are already aware of the identity. Well, but I'm talking about the statute, and I'm also talking about the latest letter that we got, which had an example, I gather, for government users of how to go about filing such an application. And from that information, it seemed to me that the government was interested in the identity. Is that not right? I mean, we're not just talking about this case. It's a broader issue. Sure, Your Honor. The statute entitles the government to obtain, pursuant to a 2703D order, a variety of non-content information. In fact, all non-content information. You're not answering my question. I know what the statute provides, but what I'm trying to find out is what the government wants. And I gather, from the latest letter that we got, February 9th, and what was attached, that the government wants the identity. Is that not right? I mean, they may have it in this case, but in some cases, they may not have it. So, isn't that right? I think it says it, in fact. Well, the answer to, I think, Your Honor's question, it will vary from case to case. There will be some cases where the government... Let me ask the question a little bit differently. When you make an application, right, under 2703D, what has to be in there? Does it need a name and a telephone number? There needs to be some information that can enable the service provider to produce the relevant records. Right. They have to know what to search for. So, you have to give them some kind of lead. It's usually a telephone number, isn't it? It might be a telephone number. It could conversely be a subscriber's name, asking if that particular person has... Could it be an address? It could be a physical address. If there's, for instance, a broadband Internet service provider, you'd like to know, you know, who is the registered customer of, say, Comcast cable for that particular address. Well, it actually says, I'm looking at Appendix B, which is the sample application and order provided, I assume, by the government, right? I mean, only the government would have provided this. Indirectly. No, I think, well, but it was produced by, I mean, not physically produced. The government made this. That's correct. Okay. And it specifically says the relevant facts, et cetera, what the person who's writing an application should produce. And it said, we'll help government investigators to identify the individuals who are responsible. That's how I came to ask you the question. They want the identity. And Part A of the attachment requests the account name, address, telephone number, email address, billing information, et cetera. So the government wants, when it doesn't know who the individual is, it wants to know who the individual is. I mean, there may not be anything wrong with that. I'm just trying to find out what the government is trying to get at with its interpretation of the statute. And one of the things is the identity. Can we put that? Absolutely, Your Honor. Okay. It took me a while for you to say yes. I apologize, Your Honor. It's a difficult statute. It sure is. Well, it's not only the identity, but it's possible, and maybe it's true in this case, you know, to discover the identity of perhaps several of the numerous other persons, right? Does it help you do that? The statute allows the government to compel any non-content record. So long as the government is able to identify, you know, what the particular. And a non-content record could be, for instance, what other number was called, right? That's correct, Your Honor. So you can trace, you know, who this person is in contact with. Indeed, and, in fact, one of the classic illustrations of the use of the statute is if the government serves a grand jury subpoena upon a telephone company, whether that is a wireless carrier, as in this case, or a plain old landline telephone service. Which is like a PIN register. Traditional telephone. What does that have to show when it has a grand jury subpoena? What's the standard? Your Honor, the test for the issuance of a grand jury subpoena is relevance. And if I can respond briefly to that question. Sure, go, please. The distinction between that and a PIN register is that a PIN register is prospective, in effect. It is an ongoing type of surveillance. What's at issue here in Section 2703 is the government's attempt to compel disclosure of historical records. Records relating to some past period as opposed to, you know, the ongoing collection of information. So I stopped you at the point at which you were telling us that they're not asking for GPS information. That's correct, Your Honor. Okay. So let me pick that up if I can. This field is growing as we sit here. They're making, getting to know information. So can we assume that it's getting closer and closer, this information, the non-content information in subparagraph C, can in time, if not shortly, know pretty closely where the telephone, where the cell phone user is? May not in the specific house, but I saw something in here, and I've been reading this for days, may be as close as 50 feet in time. Is that right? Your Honor, I think that would be an unjustified assumption. There's certainly no support for that. It's getting awfully close, isn't it? I mean, I think there's some law review article that says 50 feet, but we can disregard that. But it's getting closer and closer, right? I don't believe that's the case, Your Honor. Really? Because the information that is at issue in this proceeding is the information about which cell tower. So those big antennas that we see, you know, around town or out by the highway. Yeah, that mess up the view, but okay. Well, what about this business of, I think, I'm going to make you refer to quite a bit of triangulation. Your Honor, if I may step back and give, Your Honor, I think a page of history may be very useful to the Court here. When someone makes a 911 call from a landline telephone, the address that the first responders must go to is automatically transmitted to the public safety answering point. They know where to send the ambulance or the fire truck or the police. That, of course, was a problem for wireless phones. And in 1996, the FCC decided to issue what were referred to as enhanced 911 or E-911 regulations because there was a problem. If someone called for assistance using a wireless telephone and was unable to describe his or her precise whereabouts, so it could be a disoriented senior, it could be a kidnapping victim locked in the trunk of a car, there are various possibilities. The first responders would have no idea how to respond. And so in an attempt to respond to that public safety concern, the FCC levied an obligation known as Enhanced 911 Phase 1. This was promulgated in 1996, made effective in 1998, and it required the carriers to be able to produce through the network to the answering point, the 911 operator. The cell location, the tower location that was handling the particular call being made by the caller to the call center, it didn't work out. And the problem was because the information was so imprecise, anywhere from several hundred yards. Your Honor, I see my time is up. Oh, no, no. Thank you. Don't worry about it. We'll tell you when we've heard enough. I appreciate that. The concern that the FCC had after five years of... Just turn off the red light so he's not disturbed. Okay. The concern of the FCC after those five years of experience, from 1998 to 2003, was that cell site information, the identity of the antenna, and as we set forth in our briefs, these antennas are often divided into thirds. So you have 12 to 4, 4 to 8, and 8 to 12 on the clock face. You can think of the area covered by one antenna. Those 320-degree areas. That if all the... Your Honor... Go ahead. If that's all that the first responders receive, it's not precise enough. That the information could be anywhere from several hundred yards to miles and miles, square miles of area to search for... It could be several hundred. It could be... What did you say first? What was the closest? The closest... You call it a few hundred meters, several hundred yards. And, of course, it varies according to the... It could have been. You can get that close to several hundred yards? Yes. Yes, Your Honor. That was my question before, but go ahead. The concern of the FCC, of course, was that doesn't help you in a dense urban environment if all you know is that your emergency caller is somewhere within a 300 or 400-yard radius. Yes. And even worse, of course... Okay. So they try to get closer. Right. So... And how do they do that? What happened is the FCC... That was phase one. Yes. Cell site information. Not precise. Unable to... Okay, so... And the FCC promulgated what has come to be known as the phase two requirements, which require when a user calls 911, require that network to deliver much more precise location information, better information. Now, there are two ways, and here is where I'm attempting to just come back to Judge Tashima's question. The FCC gave the carriers a choice of ways to implement that. They could pick one of two technologies. They could either do what's called handset solution, which is essentially you put GPS in the phone, or the carrier could do what's known as network solution. And that is what has come to be known in the vernacular as triangulation, where various measurements are made from the towers in proximity to the phone to calculate a rough position for the phone. How close can you get? Well, what the regulations require is 50 meters of precision for handset solution in two-thirds of cases, and essentially for all cases, 95%, it needs to be accurate within 150 meters. For the network solution, so what Judge Tashima has referred to as triangulation, the parameters are 100 meters for two-thirds of cases and 300 meters for 95%. But that is – that's a class of information. It's separate and apart from what the government has requested here, and what's – But can you get it – leave it – does the statute permit it? Irrespective of what the government has asked for here, does the statute permit the government to – well, to request, and according to the government, to demand, if they make the requisite showing, information that would let them know where the cell phone user is within 150 meters? As to historical records? Yeah. The answer is, if the carriers retain such information, yes, it would allow – Suppose the information is last week. The statute would allow the government to obtain information under a 27-month period. Let me tell you what – oh, I'm sorry. Go ahead. Just to follow up, I think the question is, do the carriers routinely retain this kind of data? No, Your Honor. No. I mean, that's been the DOJ's experience? Yes, Your Honor. That's correct. When do they – well, but they retain at least 180 days. No, Your Honor, and if I can draw a couple distinctions here. First of all, the 180-day distinction in the statute, that's not an obligation on carriers to retain anything. No, no. I understand that. But in addition, the 180-day provisions of the statute relate to stored content. The information at issue here is not content. So how long do they keep it? The information that we're talking about here, this so-called phase two, triangulation or GPS information, they don't retain it at all. In fact, they generally do not receive it. It is not in the possession of the carrier. What they do obtain and retain over time is the cell site information. So the identity of the tower and, where applicable, the sector on the tower serving a particular communication to or from the phone. So let me try to translate that. So they know where the cell tower is, and they can find out where the cell phone is within 150 meters, right? No, Your Honor. Okay. Not going back. The only historical records, and perhaps the best illustration of this, if Your Honor, if I could refer the Court to appendix page 63, there is an exemplar of the type of records at issue in this proceeding. Go ahead. And so looking at that exemplar, what you'll see is that for each line in this chart. All right. What page? What appendix page? 63, Your Honor. Go ahead. Each line in this chart reflects a particular phone call. So we see, of course, the- Okay. We understand that. So each one shows, and the last two columns are the key information here. So we know how long the call was, what time of day, was it inbound or outbound. And the last two columns show, in the next to last column, what was the originating cell site. In other words, when this phone call started, what was the tower, and if that was a multi-face tower, which face on the tower, was handling that call. It doesn't tell us where the phone is. Those are not phone coordinates. That's just the name of a tower that is located somewhere on the ground. How far does the tower have to be from the cell phone itself? What's the closest that the tower and the cell phone can be? Well, in theory, Your Honor, I could be standing right under the antenna. But perhaps the answer to Your Honor's question is, if you're asking how close are the towers to each other- No, the towers to the cell phone. I can be as close as standing right next to the tower, or I can be several miles away. Okay, but the tower can tell if you're as close as you and I are. No, Your Honor. If I'm the tower. Let's say you're the tower, and I'm the cell phone. So that's what I'm asking, how close. This does not reveal distance information. As a matter of physical whatever we're talking about, how close can the government get the information, if they have it, of where the tower is and where- There's a reason for these questions. I'm coming to that. Where the cell phone is. What's the closest? Your Honor, I think the best answer to that is in Judge Gorenstein's opinion. This is a Southern District of New York opinion from 2005, where he examined a map of the cell towers- So what's the answer, wherever we get it from? The answer is a few hundred meters. Okay. All right. Let me tell you, as I work on this, I listen to the news, and you know that there are governments in the world that would like to know where some of their people are or have been. For example, have been at what may be happening today in Iran, have been at a protest, or at a meeting, or at a political meeting. Now, can the government assure us that, one, it will never try to find out that information, and two, whether that information would not be covered by D? Your Honor, I can't speak to future hypotheticals as to what might happen. But don't we have to be concerned about that? If the statute would permit the government, not this government right now, but a government, to get information as to where a- Your Honor, the information at issue in this case certainly is useful. That's why the government's applying for it here. But without showing probable cause, because it's relevant. Your papers admit that the showing that needs to be made for a subsection D order is less than the showing that needs to be made for a warrant. That's correct, Your Honor. Okay. So the question is, can D be used for that purpose? Yes, Your Honor. It can be used constitutionally for that purpose. And the reason- I understand Your Honor's concern about those future cases, those hypotheticals. But I think it is clear under the Supreme Court's case law that Fourth Amendment issues must be measured on the basis of the facts before the court. But I'm not talking- I've set aside the Constitution. My concern- I don't know. I can't talk for Justice Schumer. But if we can decide this on a statutory basis, then aren't we obliged to do that rather than hypothesize what the decision would be under the Fourth Amendment? Absolutely, Your Honor. Ashwander compels that. Okay. And the statute- Congress knew how to say when you have to show- come up with a warrant. And that's a constitutional requirement. And it did that in A when it was looking at content. Yes, Your Honor. It didn't say a warrant in D. And that, I gather, is what concerns Magistrate Judge Linnehan. Your Honor, I think part of the problem here is that Magistrate Judge Linnehan had before her no actual factual record. Magistrate Judge Linnehan did not solicit and therefore did not receive any briefing whatsoever from the government on the nature of the information. And left, I think incorrectly, to a series of conclusions about the quality of the information, about how precise it is. The government redacted most of that. I tried to figure that out. And most of that is redacted. All that's redacted from the exemplar on page 63, Your Honor, are the phone numbers, the two phone numbers, the calling and the receiving phone. So there is no other information redacted from this exemplar. What you see there is all the location information that we would obtain. Mr. Ecklweiler, let me move back to where you were several minutes ago. But as far as this application is concerned, then, it's your position that in terms of revealing the location, it won't reveal location, you know, probably any closer to the location. Closer than a couple hundred yards. Is that what you're saying? That's correct, Your Honor. No, but no better than that. Now, is this true? How close or how closely a cell phone user can be tracked on the basis of this kind of information depends partly on the location. In other words, in certain areas, cell phone towers are much more situated, much more closely together. So, you know, to move from one cell tower to another is a much shorter distance. So you can place a person, you know, closer to the tower where the towers are more far apart. Is that true as a general proposition? Your Honor, it is true that the towers are much more closely spaced in dense urban areas such as Manhattan. Yeah. What about Nelson? I'm sorry, Your Honor. Or Philadelphia. Or Philadelphia, absolutely. In any densely populated urban area, because there are more callers, there's more need for network capacity, towers will be situated more closely together. Now, doesn't that enable whoever reads these data to deduce that, you know, that cell phone user is, you know, closer to the tower than it would be when the towers are spread further apart? The government can make that inference, and it's generally a justifiable inference, although I do want to emphasize there is a caveat here. And we note this in our brief. The user is not – the user's phone is not always being served by the closest tower. There are various things that happen, particularly at rush hour, if there's a lot of traffic downtown and everyone is on his phone making a call. The next person who takes out his call to place a call is not going to be able to talk through the tower that is nearest to him. He may be bumped over to the next tower that's, you know, 500 yards or a quarter mile, you know, however far away it is. So it is not with any degree of certainty. Now, it's generally true that the calls are placed through the closest tower, but it is not invariably the case. So even though you can't track the cell phone to closer than, say, within, you know, we'll say a couple hundred yards of cell towers, you can get a general track, can't you? I mean, you know, somebody, say, you know, going from Washington, D.C. to Philadelphia, right? And if the person is, again, to look to historical records, that would be true if the person were constantly making and receiving phone calls. If Your Honor takes a look at appendage page 63, that same exempar, you will see these are not records from every seven seconds or every seven minutes. These records relate solely to actual communications occurring through the phone. So when the phone call starts and when the phone call ends. But if the phone is not in use, the phone may be on, but the records are not generated. We cannot go back in time and get those. And that's why, Your Honor, when we look at the times and dates here on appendix page 63, you see that there are at various points periods of. They're pretty close, 659 p.m., 643 p.m. Your Honor, there's a jump, there's a call on the 1st of May, for instance, at 557 p.m. Yeah, but some of them are really close. That's true, Your Honor. And the question is not, the question really is what can the government get, right? And they can get very, here's 433 on the same day, 439 p.m. on the same day, 440 on the same day. That's pretty close. And, Your Honor, the calling records, the numbers that are being called or from whom calls are being received by the same user, we can compel those with a subpoena. That's right. That's right. And as I read this, you can compel a lot of the information that it looks to me like you wanted, maybe even in this case, you could have gotten with a warrant. And I don't understand, I didn't think the magistrate judges, I've been on this court for 30 years, more than 30 years. The magistrate judges that I have seen are not very grudging about granting warrants. If you could have gotten a probable cause warrant, why do you want to make the point that you don't have to show probable cause? Well, it's interesting, Your Honor, because the rationale that was adopted in this case by the lower court wouldn't limit the reviewing court, the court to whom the application is presented, to demanding probable cause. Under the rationale that was articulated below, the court could demand proof by preponderance of the evidence. Judge Lanahan's opinion says that it's up to the court to decide, in effect, what showing could be made. So, you know, it vests the trial court, the magistrate judge, with what's essentially unlimited discretion to decide what showing should be made. And the government submits to Your Honor that that's an inappropriate exercise of judicial discretion, that that's the plan. You're concerned that the magistrate will give you the warrants even if they don't have enough basis? Is that really the government's concern? No, Your Honor, I'm saying the opposite. I mean, it's backwards, yeah. Your Honor, I'm saying that the magistrate judge could demand an even higher showing than probable cause. Well, then they'd go off to on appeal, and the district judge wouldn't accept that. But that's why we're here today, Your Honor, because the magistrate judge demanded a higher showing than is required under the statute. But didn't require more than probable cause. Your Honor, that's correct. I never saw that before. Did you ever see that before? I have not, Your Honor. Neither have I. Five magistrate judges signed on to this opinion, affirmed by the district court. They didn't demand more than probable cause. They demanded just probable cause, the constitutional standard. But the statute only requires the government to make a showing under the text of Section 2703D specific and articulable facts. Okay, let's go to the statute. The statute, 2703D, says may. It doesn't say shall. Throughout that statute, it says shall. I've found it several places. But on 2703, it says may. And the magistrate judge starts out, I think, by saying, we don't have to – I'm not doing – I don't have to give you – I don't have to give you an order. And in my discussion, I won't give you an order. Isn't that what may means? Your Honor, in interpreting the statute, I submit that the court must – as this court has held in the Tavares v. Klingensmith case, cited in the briefs from both sides, the court must look to the overall structure of the statute. And what is in some ways unique about the Historic Communications Act is that there is a range of compulsory mechanisms set forth in the statute that the government may use or is required to use depending upon the particular kind of customer records that are sought to be obtained. So we see, for instance, in Section 2703C2, that's a list of things the government can get with a grand jury. But let's go to D, because D is what's involved. D says the court order for disclosure may be issued by any court of competent jurisdiction and shall issue only if the government offers the following. It doesn't say shall be issued in the first part. So why doesn't the magistrate judge have discretion? Because, Your Honor, it's clear that a 2703D order is different from a warrant. The statute also explicitly mentions in Section 2703C1A that one of the other mechanisms by which the government may compel non-content records is a warrant using the procedures described in the Federal Rules of Criminal Procedure. So we have this range of options, a subpoena, a 2703D order, or a warrant. If the court is free to demand probable cause in a 2703D provision, this provision of statute becomes a dead letter. It's like demanding a warrant. The Congress has set out a separate mechanism, that intermediate standard, that does not require a showing of probable cause. And so in order to prevent Subsection D from becoming a nullity, the court, I believe, has to understand that Congress has made a decision that the judge does not have discretion to demand more. There's a separate provision where the government can show probable cause and obtain a warrant. Isn't your construction making a C1A nullity because that says what the government can do is obtain a warrant? And if the government can always get the information, the records, on information less, on a standard less than a warrant, then why would you even ever ask for a warrant? There's a very simple reason, Your Honor. As set forth in our brief, there are occasions, this happens not infrequently, where the government wants to obtain both content and non-content. But C doesn't deal with content. That's correct, Your Honor. Okay, so I'm talking about C. I understand, Your Honor, but it would be the same warrant. If I may give Your Honor an example. Suppose an investigator is investigating the user of a particular Yahoo email account. And the investigator wants to obtain the stored content, so the email that's in the account, in the possession of the service provider, Yahoo, but also wants to obtain transactional information or subscriber information, who the user is, how they paid for the service, how long they've had the service, and so on. A single warrant may be used to compel the disclosure of all of that information. And that is why Section 273C1A for non-content is there. If that weren't there, the government would have to get a warrant for the content and come up with some other piece of compulsory process to generate more paperwork. So you're not really telling us that the whole point of this is that the government doesn't have to show two pieces of paper, just one piece. I mean, really, that can't be the government's decision. Your Honor, that is the government's understanding of why Congress structured the statute in this way. Do you have any legislative history to show that? Your Honor, I'd be happy to provide some supplemental briefing to the court. We have enough briefing right now. I don't think we need any more. I'm sorry, I didn't mean to take it. No, go ahead. Yeah, you're okay? Would you tell us that there seems to be a big dispute as to whether we're dealing with electronic or wire? The answer here is neither, Your Honor. This is information about the communication. A telephone call is a wire communication. But what's at issue here is not the content of what's happening in the telephone call. What's at issue here is very similar to the numbers dialed to place the telephone call. It's auxiliary information. It's information about, but it's not the substance of the communication itself. Now, a telephone call is a wire communication because under Section 2510, the definitions, it involves the human voice, that the term of art in 2510 is an aural transfer. And so that's what makes it a wire communication. So that when I saw the wire on TV, they were talking about telephone. I mean, they would go into telephone booths and make these phone calls that were being checked by the government. Those were wires, and that's not what we're talking about here. Excuse me. I'm actually not familiar. I am generally familiar with the program. You are? You mentioned you never saw the wire? Your Honor, I have enough to keep me busy in my day job. So am I busy. Go ahead. I didn't mean to imply otherwise, Your Honor. Congress created, again, if I can just step back. I'll try not to make it a full page of history this time, Your Honor. Both in the 1968 statute as originally enacted, Title III, the Wiretap Act, and then as amended in 1986, Congress created this framework where we have three kinds of communications that fall within the scope of the statute. There are aural communications, so that's communications in which there is no technology in the middle. That's two people having a private conversation in a closed room. Then we have wire. Which they sometimes tape, sorry. Whatever, however you do that. Okay. And then we have wire and electronics. And the key distinction between those two terms, as they are defined in Section 2510, is that a wire communication necessarily involves an aural transfer, and then that term is just like Russian dolls. You have to peel away the layers of the definition. An aural transfer is defined in Section 2510. A-U-R-A-L. A-U-R-A-L. Yes, Your Honor. As a communication that involves a human voice. So to boil that down very simply, a phone call where two people are talking to each other. That would be the classic instance of a wire communication. An electronic communication is all those other kinds of communications, email, pager messages, and so on, that does not involve the human voice, but which traverses some sort of interstate network, or at least a network with an interstate nexus. If not myself, let's hear from the amici, and then we'll get you back. Thank you, Your Honor. You can look forward to that. Good morning, Your Honors, and may it please the Court. Kevin Bankson for the EFF amici, and for the record, I too enjoy the wire. I didn't say I enjoyed it, I said I watched it. Point well taken. We're here to argue in support of the lower court's holding that the Fourth Amendment protects cell phone location information and requires the government to obtain a search warrant for acquiring it, as well as in support of the holding that the Stort Communications Act gives judges the discretion to require such a warrant. My fellow amicus, Professor Freewald, will be arguing solely on the Fourth Amendment. She's just arguing a couple.  Yes, ma'am. Go ahead. I also hope to address the Fourth Amendment but hope to focus primarily on the statute because it's how we construe the statute that will define whether the court must address or can avoid the constitutional issues. I want to address some questions that came from the bench earlier. I think you were right, Your Honor, to focus early on on the breadth of the types of data that can be obtained under 2703D. Essentially, any record that a communications provider has on a subscriber or customer can be obtained under 2703D, and that includes not only the single tower data shown in the exemplar, the tower and sector data, but triangulation data or GPS data or, as you pointed out, email. And I think GPS is important to this case. As the submission we made showed in a model application, the government believes it could obtain GPS data under 2703D. And so for that reason, we think that quibbles over accuracy in this case are a bit of a red herring because how the court construes the statute here is going to define how it's applied in later cases. Just a minute. Don't you think a rule on GPS and all these other things that are not part of this application, I mean, you're asking for an advisory opinion, aren't you? Absolutely not, Your Honor. With respect, we're actually counseling that as part of the doctrine of constitutional avoidance, you need to consider the impact of your ruling on future cases. So to the extent if you were to rule that 2703D did not give courts the discretion to require a warrant, that would apply in another case where the government is seeking highly accurate GPS. No, but suppose we said, well, in this case, it seems to be okay because it's not that precise, but we're telling the government now that don't make an application and ask for GPS information because it would violate the Fourth Amendment. Should we say that? No, Your Honor. Well, it seems to me you're asking. I'm sorry. Actually, Your Honor, we're asking you to affirm the court's holding that it had the discretion to require a warrant. No, no, but the reason you're saying we should because it involves things like the GPS information. Well, to be clear, you think that the data at issue in this case is accurate enough to implicate the Fourth Amendment. All right, let's talk about that now. You see the government said their position is, well, the closest you can really get is within a couple hundred yards, right? You dispute that as a matter of fact? We do, Your Honor. How close do you think this kind of information can, as a general proposition? Well, Your Honor, looking at the record, there is actually nothing in the record that defines the upper limit of the precision of this data. The closest that we have, the best example that we have, is the testimony of the FBI's own cell location expert, Agent Shute, in a local bank robbery case. And the government quotes part of that in its own brief at page 7, where Agent Shute specifies, looking at the exact same type of data from the same carrier in this case, he was able to pinpoint a suspect to a particular block, the 1300 block of West Lehigh Avenue here in Philadelphia. And I hope the court may take judicial notice upon looking at a map. I went online and looked at several maps of the area. That's .1 mile. That's 528 feet. So that is fairly accurate data, and even so, we still don't know how much more precise it might be. And that is why we argued in our brief and argue here that if you believe that the question of accuracy is truly critical to deciding this question, that a remand for an evidentiary hearing would be the most appropriate path. So you think that level of preciseness is sufficient to invoke the Fourth Amendment? Certainly, Your Honor, under the location tracking precedence of Carolyn Knox. There's been a myth fostered by the government's discussion of those cases that the beepers there were very precise. But they were not. They were very crude. It was essentially, it told you whether you were getting hot or cold, whether you were getting closer to the beeper or not. It didn't specify, well, the beeper is in that direction, 40 feet away, therefore you know it's in the house. Rather, using that crude information, the government inferred the location of the beeper inside of private spaces. Justice Scalia makes specific reference to this in his Kylo decision where he discusses why the fact that the government is inferring facts about the inside of the home doesn't insulate the search. No, but Kylo to me is entirely different because he really talks about what's going on inside the home, right? Inside the home. And there's nothing like that here, inside the home. Well, I mean, as Agent Schutz's testimony shows, the government does routinely use this type of information to place people at and in particular residence. At a place, but not, you know, they don't try to find out what's going on inside the home. Well, to be clear. Except maybe make a cell phone call. Under Carolyn Knox, the Supreme Court wasn't looking for whether the beeper revealed the movements of the item in the home. It was looking to see whether the beeper was used to confirm that the article was in fact in the home. Which is a fact about the interior of the home that the government otherwise would not have known but for a physical search. So there's no need to be able to track a phone within a house.  And indeed, it is not necessary to be able to track it and pinpoint it within the house. But rather, simply information allowing the government to infer that the phone is in the house is sufficient. Again, as Justice Scalia explained, Cairo in the Kylo case. But I think there's another example. I mean, essentially the government is trying to say that under the Cairo case, general vicinity information is not protected. But that was not the rule in Cairo. The question was, does surveillance that reveals information that could not have been viewed from public surveillance, does that tread upon the Fourth Amendment? And the answer was yes. What are you afraid of? What are you concerned about that the government will ask for or get? I'm concerned that the government will obtain information that reveals facts that people have a reasonable expectation of privacy. And that is facts about the location of their phone, even when it has been withdrawn from public view. And we believe that under Cairo, that those facts are protected by the Fourth Amendment. However, I also wanted to elucidate a bit on the rule in Cairo about if it was not visible from public surveillance, it's protected. A simple hypothetical will demonstrate how even if the cell phone data is very imprecise, it will reveal information not available through visual surveillance. Consider the suspect, Bob. He is under visual surveillance. Bob is seen walking into his office, talking on his cell phone. So the government knows he's carrying his cell phone. He makes a call from the office. They confirm that he's got the cell phone. He then puts the cell phone in his pocket, walks home, and then makes a call at home. From that fact, they can infer that the phone is in his home. However, that fact was never revealed via visual surveillance and could not have been revealed via visual surveillance. Therefore, the government has learned that the phone is in the house, something it could not otherwise have learned but unless it had done a physical search. Under Cairo, I think it's clear that this would violate the Fourth Amendment without a search warrant. But if I may, Your Honor, go back to the statute, and it's worth looking at its specific language. It says that a court order may be issued by any court that's a court of confident jurisdiction and shall issue only if the government offers specific and articulable facts. Skipping over the standard a bit. I think the key language there is the shall issue only if. I think it's worth noting that the phrase about jurisdiction may be issued by any court was not in the original 1986 Act but was added in 1994 to clarify which courts have jurisdiction. So really the key language is the shall only if, shall issue only if. The government argues that this is mandatory language, that if the government makes a showing, the court must issue the D order. However, this reading renders the only surplusage. As the lower court correctly found, as the Supreme Court has held, and as the Third Circuit itself has recently held, recently in Township of Tinicum, which was one of our 28J authorities, only if has a specific meaning. It identifies a necessary but a not necessarily sufficient condition, meaning that the government has to make this showing to get a D order. But that the court doesn't have to grant the order if it makes this showing. Any other reading of the statute would render that only surplusage. Excuse me. The problem I have with that interpretation, and the government argued this, is that it vests in the magistrate, and this is what Magistrate Monahan said, the discretion to determine the standard of showing necessary. It's completely discretionary with the magistrate, and as your opponent said, well, in this case, the magistrate said, you've got to show probable cause. In the next case, it could be a higher standard. It's hard for me to see, when they have this phrase in here about what showing is necessary in the statute, to read the statute as giving the magistrate sort of a blank check in terms of what discretion to exercise. Your Honor, the discretion is not unbounded. First off, to be clear, the discretion is either to grant or deny the order. It's not discretion to say, well, if you want a D order, then you need to give me this. It's either to grant or deny, and by denying, require the government to instead seek a probable cause warrant. That discretion is, of course, bound by abuse of discretion. The court cannot abuse its discretion and deny an order because it got up on the wrong side of the bed or doesn't like the prosecutor or anything like that. In terms of the standard, if the option is either a D order or if denied a warrant under Rule 41, Rule 41 specifies that if the government makes a probable cause showing, the court must issue the warrant. And so the government's fear that courts will willy-nilly be throwing around all kinds of new standards is simply not the case and not supported by the statute. The question is, does the court have the discretion to deny a D order even if the showing is made and instead require a warrant? And we think the plain language is yes. You make a big point in your brief that a cell phone should be considered a tracking device. We actually do not, Your Honor. We took no position on whether a phone should be considered a tracking device under the statute. Oh, okay. In the very first pages of our brief, we agree with the government. I'm sorry. No, go ahead. For Judge Roth, I just want to be near the mic for Judge Roth's benefit. Yeah, no, go ahead. We agree with the government that the cell site records at issue here are records pertaining to a subscriber or customer of an electronic communication service and therefore fall within the ambit of the Storage Communication Act, regardless of whether a cell phone is considered a tracking device or not. And so we have taken no position on whether a cell phone is a tracking device under the statute's definition of such. Am I wrong that you do take a position that it's wire versus electronic? No, Your Honor. Well, so that discussion goes to – that's from the – so that is from the government's argument where they disagree with Judge Lenihan, as do we, as to whether or not this data is actually covered by the Storage Communications Act. And we agree with the government that it is covered by the Storage Communications Act. That is one point of agreement that we have with the government. But back to the statutory language, I think that the shall, only if language – oh, I see I'm out of time. No, no. Oh, thank you. We gave him time. You may not get as much time, but you're going to get more time. Yes, Your Honor. The only has to have some meaning or else it's surplus. The government proposes one reading, which is, well, without the only, then the government could issue a deorder on specific articulable facts, or it could issue it on a lesser showing. But this is an absurd reading if you compare the other surveillance statutes, which all use if rather than only if. If the government's reading of what only means were correct, then a court could issue a warrant under Rule 41 without probable cause. It could issue an order for a pen register under the pen register statute without the required certification. It could issue a wiretap order under the wiretap statute without probable cause as required by that statute. And this is clearly not the case. And so the only reading of the statute that gives only meaning is what we call the permissive reading, the one that gives the court discretion, as opposed to the government's mandatory reading. There are some statutes that expressly limit what the government can get. They say, but you shall not get. What is the material that the statute says the government cannot get? This statute. Not this one. There are other statutes too, aren't there? I just can't find it right now. I'm afraid I'm not sure I understand your question. There are two statutes that govern prospective surveillance of your communications activities. And the pen register. There's the wiretap statute for content and the pen register statute for non-content. As you've discussed, 2703 of the Stored Communications Act governs access to both content and non-content. And depending on the age of the content, it may be strongly protected. The statute does not specifically carve out any particular types of records as being unobtainable. Under the plain language of the statute, any record pertaining to a subscriber or customer of an electronic communications service is obtainable. And that's why we continue to try and focus the court's attention on the fact of these other more precise types of records, such as GPS. Because if you accept the government's mandatory reading, then the court will have to issue de-orders, 2703 de-orders, on the specific and articulable facts showing no matter what type of record is at issue. And so even if you don't think, and we do believe, even if you don't think that the record at issue here implicates the Fourth Amendment under Carroll and Knox, certainly more accurate data such as GPS does. And yet that data would be equally obtainable under this statute, as demonstrated by the fact that the government's model application includes GPS as one of the things sought under a de-order. Okay, thank you. Thank you. Good morning, Your Honors, and may it please the Court. I am Susan Prewalt, professor at the University of San Francisco School of Law, and I'm an amicus. This case presents a Fourth Amendment issue of first impression about the government's use of a truly novel technology that can invade the privacy of all Americans who carry cell phones in their pockets in person. When the government acquires historical cell location information, it effectively commandeers our cell phones and turns them into electronic trackers that report, without our knowledge or consent, where we have been and how long we have spent there. We should be able to use our cell phones without them creating a virtual map of our every movement and association. First of all, Ms. Prewalt, do you agree with the government's position that in the usual case, you know, the tracking is not more accurate than within a couple hundred yards? Your Honor, no. It's a complicated question in the sense that it depends on what records are available to the government. And there are many cases in which government has asked for much more detailed information than just information about the beginning and end of a call. For example, they've asked for multi-tower information that can be used to triangulate the data to quite a bit more accuracy. For example, there's a case from Texas. Mr. Eckenwalder says that triangulation information is not routinely stored by the providers. With respect, I'm not sure what the basis for that claim is because… Well, that's not an issue here, is it? Well, if the issue is what is available under the statute, then I think it is important that it… Well, but in this case, that's not what's sought in this application. Your Honor, it's actually not clear what's sought in this application. The government's exemplar does not match what they've asked for in their application. As you know, the application is not in the public record. In addition, it's not clear exactly what information will be furnished to the government in response to whatever their application… Well, let me ask you this. To your knowledge, do cell phone providers routinely store triangulation information? Your Honor, cell phone providers do not want to reveal what… Are you saying you don't know? I don't know what they store. I do know that they are able to collect that information. I do know that they have been requested… You don't know to what extent that information is available to the government under the Stored Communications Act, because you don't know whether it's stored. I do know that they collect the information, because the government has requested that they… You mean collect it routinely for every cell phone user at, you know, every seven seconds? Again, Your Honor, I know the government… Answer that has to be no, huh? I don't see why they would collect and store that information. I would hope they wouldn't get to that point. I certainly would hope that. But, as you know, storage costs have gone down incredibly all the time. So it appears from the exemplar that cell phone companies retain databases of whatever information is needed. In fact, in the case involving Judge Gorenstein case out of New York, the court said that the provider was providing raw data to the government that they, in turn, could put into a spreadsheet. In the case out of Texas, the government asked for multi-tower information that included signaling data, the angle and strength and timing of the signal. Another court has pointed out that the difference between – as well as Magistrate Judge Lenihan – that the difference between historical data and prospective data is rather arbitrary, because the government could say, we would like you to store this data, and we'll be back in a short amount of time to pick it up. So I do think that it would – that if we didn't – if this court were not to require a warrant, then it would be too easy for the government to go to service providers and ask that they record this information about people, and it would be very, then, easy for the provider to do that recording. I also would like to respond to the notion that the key fact is what's in an ordinary business record or a routine business record, because that really is not the constitutional question. The question is whether or not the customer has assumed the risk of the disclosure of information by voluntarily providing it actively and knowingly for use by the company and for view by the employees. And that's what happened in Miller and in the Smith case, and that's not at all what happens here. Because in these cases, the information is generated automatically by the company without the knowledge or input or control of the user. So I think that's a very important distinction between Smith v. Maryland and Miller v. United States that is a key distinction for our purposes. In addition, the government makes much of the fact that this is non-content information, and I would just like to point out that for constitutional purposes, that's not a significant categorization. The court has never held that non-content information is not protected by the force. Smith v. Maryland merely held that the telephone numbers dialed were not protected, not that any information that was not content was not protected. And there are other Supreme Court cases which have found that information that is not content is nonetheless protected. Cell site location data is much richer and more revealing than the information in either Smith or Miller. It can reveal intimate information about our personal meetings with our friends, our families, and our associates. The government wants the benefits of this powerful new technology without accepting the minimal responsibility of proving probable cause to a judge, which the Fourth Amendment requires to prevent overuse and abuse of this intrusive new tool. Thank you very much. I want to ask you one question, right? Just summarize for me, in as few words as you can, why you believe that the Fourth Amendment applies to, I'll call it, cell phone tracking data. Because users have a reasonable expectation of privacy in that data, and because we shouldn't live in a society where the law enforcement agents should be able to access that data without subjecting themselves to judicial review provided by the probable cause warrant. Now, when you say people have a reasonable expectation of privacy, is it because it reveals their location and their movements? Is that why? It's for a variety of reasons, but yes, because it is a particularly intrusive technique that is powerful and subject to abuse, that reveals personal data, including data about things that go on in the home, but that also can create a virtual map of our activities. Wait a minute. What do you mean by things that go, like, what can it reveal that goes on in the home? Well, again, as my co-amic, he argued, it doesn't have to reveal specific information, like when you're in the bath or... What does it reveal? What goes on? It reveals, for example, when you're home, how long you're home. It could easily reveal who's in your home with you. It could have information on more than one cell phone. It reveals when you're awake, if you're making calls, how long you're awake. Are you sending text messages, perhaps? Are you browsing your email? It's much more intrusive than... But that's premised on the assumption that a tracking device can track you precisely to your home. Well, actually, Your Honor, as I went into some length in my brief, I think with a simple imprint, one could add, particularly because it's historical information, one could take information about the nearest cell tower and add it to the fact that that is the cell tower nearest the home, add that to the fact that the information shows that the person was there, for example, from midnight to 8 o'clock every day, and then very quickly be able to tell that you were in your home. So it's like a piece of the puzzle. It's a very revealing technique that is extremely intrusive into people's private lives. All right. Thank you very much. Thank you. I appreciate your... I really appreciate your coming all the way out here from San Francisco. Thank you. My pleasure. As did he, from another part of California. Tyler, I'd like to pick up this question of the tracking, if I can. Section 2510.12 excludes tracking devices, right? Specifically, it excludes any communication from a tracking device from the definition of an electronic communication. Correct, Your Honor. And so, as you understand it, Congress doesn't permit the government to secure information from tracking devices without a warrant or showing a probable cause. I would disagree strongly with that proposition, Your Honor. To begin with the statute, the reason that that's there, I think, is to exclude from the ambit of Title III the communications that might come from the government's own installed tracking device, such as one attached to a vehicle. But it is clear, Your Honor, from the Knott case, in which a tracking device was installed and used to follow the movements of a car, the Ninth Circuit has a case, the MacGyver case, in which a tracking device... I know. Go ahead. ...in which a tracking device was installed and used, and the Ninth Circuit held that no warrant was required. The Seventh Circuit has followed suit in the Garcia case in recent years. There is no substantial disagreement among the circuits. So, no, the government is not required to use a warrant when it uses a tracking device. There are occasions, and the Supreme Court's decision in Cairo maps out the contours of the rule. There are occasions when the government, by monitoring information from a tracking device, may intrude upon a Fourth Amendment protected interest. And the rule in Cairo, we set this forth both in our opening brief and our reply, the rule is very clear that it is only when the government learns, by monitoring the tracking device and solely by means of monitoring the tracking device, about the presence of the tracked object within a specific protected space. It's not enough to get close. This is not like you're getting warmer. And, in fact, there's explicit language in Cairo where, as the can of... it was a can of ether, in that case, with a beeper in it. It moved through a variety of locations. The government, at one point, tracked it to a multi-unit storage facility. It was a warehouse where individuals could rent lockers, but there were multiple lockers. The government tracked the object to that building. It even tracked it to a specific row of lockers, but not to a particular locker. And the Supreme Court held explicitly that none of that activity constituted a Fourth Amendment search. It would only have been had the government, by means of monitoring the tracking device, and solely by that means, learned that the can was in locker number 143, that the government would have crossed the Fourth Amendment line. So, I think it's important. Amicus for EFF here talked about how the records that issue, in this case, intrude upon a Fourth Amendment interest. They cannot, they do not have sufficient precision to reveal the presence of a telephone within any particular space, even down to the most precise those records can be in a dense urban environment, a few hundred meters. And I think CARO is controlling on that point. What's the relevance of the fact that the definition of electronic communications exclude wire communications? Just to make clear that a particular communication, Your Honor, can only be one or the other. It cannot be both at the same time. And cell phones are? Well, communications made through a cell phone can be wire communications. It can be electronic communications. I thought you said it can't be one or the other. Well, an individual… Fish or fowl. Fish or fowl, but not both, Your Honor. The reason being that a telephone call is a wire communication. It involves the human voice and our oral transfer. So wire you define as oral communication? Correct, Your Honor. But there could be other kinds of communications through the phone. There would be electronic communications. The most obvious example of that would be a text message. But the record that issue here are not the communications. And I really would like to emphasize… But they're not content. They are not content. It's historical data. That's right. We started with that. We understand that. Okay. Your Honor, if I can turn for one moment. I'd just like to speak to a couple of the points made. Well, you've used up a lot of time. Just do it quickly. Yes, Your Honor. The rule that's urged by Professor Freewald here would, in fact, it would occasion a sea change in law enforcement practice. The government can compel traditional telephone calling records by means of a grand jury subpoena. But under the rule that's urged by Amiki here, even though a simple landline telephone calling record, not cell site data, but just when a call was placed from a telephone in the home, under her rationale, that, too, would be Fourth Amendment protected. We think that's unsupported anywhere in the law, and we would urge the Court to reject that. And finally, Your Honor, if I can speak to a point that Mr. Bankston made about the unbounded discretion of the lower court in imposing whatever standard it chooses, counsel claimed that if the magistrate judge refuses to issue – I don't think we have to worry about that. I mean, I've been reading magistrate judge orders. Have you ever seen a magistrate judge – well, you're in the Department of Justice. Ever seen a magistrate judge who would require more than probable cause? I have not, Your Honor, but I have also never seen a magistrate judge demand probable cause and not be reversed when the government is seeking – Well, that's a different issue. Certainly, I have never seen a magistrate judge demand more than probable cause. The issue is should the magistrate judge demand probable – can the magistrate judge – may the magistrate judge demand probable cause. That's the issue. And, Your Honor, our position is no. For all of those reasons, we would respectfully urge the Court to reverse the lower court and remain – Why does the Constitution require probable cause? Why does a warrant have to – why do you have to have – why do historically we always require probable cause? Your Honor, I think the answer to that is a fairly complicated one. I'm not sure I'm competent to answer that question in the short time available to me. But you accept the fact that historically that has been the standard? Absolutely, Your Honor. For information that was within the ambit of the Fourth Amendment, unlike the information at issue here. Okay. Thank you. Thank you, Your Honor. We'll take the matter under advisement. We'll let Judge Roth listen to this long dish and get back to us. Thank you. We'll hear the Jones case next. See you. They're all here. Yeah. Happens all the time. Right. We're in the Ninth Circuit. Well, that's coming up. But we do have vacations.